Arvid and Antonia Strand, et al. [1] v. Commissioner. Strand v. Commissioner
Docket Nos. 46301-46303.
United States Tax Court
T.C. Memo 1954-109; 1954 Tax Ct. Memo LEXIS 129; 13 T.C.M. (CCH) 703; T.C.M. (RIA) 54215; July 30, 1954, Filed *129 Robert O. Beresford, Esq., for the petitioners. Francis J. Butler, Esq., for the respondent. MURDOCK Memorandum Opinion MURDOCK, Judge: The Commissioner determined deficiencies in income tax for 1949 as follows: Doc. No. 46301
Arvid and Antonia
Strand
$2,537.58
Doc. No. 46302
Elmer and Jose-
phine Strand
2,049.38
Doc. No. 46303
Ray W. and Luella
Strand
2,379.18 The issues argued are (1) whether amounts advanced to a corporation by a partnership, in which the male petitioners, hereafter called the petitioners, were equal partners, were loans or capital contributions and, if loans, (2) whether they were business or non-business bad debts, and (3) whether $2,305.59 paid by the partnership to creditors of the defunct corporation was deductible under section 23(a)(1)(A). The facts have been presented by a stipulation which is adopted as the findings of fact. The returns of the petitioners were filed with the collector of internal revenue for the District of Washington. [Findings of Fact] The petitioners were equal partners carrying on a profitable general building construction business in Seattle under the name of Strand & *130 Sons. That business was growing during 1945 and subsequent years and required large quantities of lumber and timber products which were exceedingly difficult to obtain. Strand & Sons negotiated with Bride & Allen in June 1946 to procure a small planer mill owned by the latter but found within a few days that the mill was too small to supply its needs. Strand & Sons learned prior to July 8, 1946 that the sawmill of Nagel & Stevens Lumber Co., at Grotto, Washington, could be purchased and, with the addition of the Bride & Allen planer, could provide a substantial supply of timber products. Arvid and Elmer Strand and Bride & Allen decided prior to July 8, 1946 to organize Grotto Lumber Company, Inc. Bride & Allen were to accept 34 shares of Grotto stock for their planer and were to advance $10,000 to the corporation. Arvid and Elmer were to pay $30,000 for 300 shares of Grotto stock. Grotto was to pay $25,000 for the sawmill and was to have $15,000 of working capital. Arvid and Elmer, acting on behalf of the corporation to be formed, made a down payment of $5,000 on the sawmill on July 8, 1946. Grotto was incorporated on July 12, 1946. It developed after July 8, 1946 that Bride & Allen *131 could not raise the $10,000 and that their planer was obsolete and inadequate so they dropped out of the deal. Grotto, with the $30,000 paid in by Arvid and Elmer, acquired the sawmill of Nagel & Stevens Lumber Co., its logging equipment, and a lease on some land and timber rights for $25,000 but it had no planer with which to finish its lumber. Grotto was unable to procure sufficient logs from others to operate its sawmill at full capacity and it needed additional funds to buy a planer. It bought and installed a planer late in February 1947 with about $3,800 advanced by Strand & Sons. The incorporators of Grotto anticipated that it would need not to exceed $20,000 of which Bride & Allen were to advance $10,000 and the rest would have to be loaned or advanced by Strand & Sons or the individual partners. Actually Strand & Sons advanced many small amounts from time to time to Grotto as accounts receivable. The net advances for the first fiscal year of Grotto ended June 30, 1947 were about $73,820.80. They were up to about $158,000 at June 30, 1948 and were about the same on June 30, 1949. $12,213.96 was then due others. Grotto carried the advances as accounts payable. The advances *132 included those for the planer, some needed to buy standing timber on lands near the sawmill and some for logs purchased from loggers. Grotto operated its business from July 1946 until September 7, 1949. Its capacity was increased about sevenfold and eventually it was able to supply the needs of Strand & Sons and sell excess products to others. It reported a loss of $19,995.32 for its first fiscal year, a profit of $1,903.07 for its second and a profit of $17,546.63 for its third. Shortly thereafter, on September 7, 1949, a fire destroyed its mill, mill machinery and equipment. One million board feet of processed lumber, 250,000 feet of logs in the pond, 750,000 feet of logs colddecked at the mill and 3,000,000 feet contracted for and in the process of delivery to the mill were undamaged. The need of Strand & Sons for lumber had eased, it could then obtain sufficient lumber on the open market and it was decided not to rebuild the Grotto mill. The lumber on hand was sold and the proceeds were used to pay creditors. The remaining lumber and some equipment was transferred to Strand & Sons at fair market values to reduce the balance then owing on the open account. All creditors except *133 Strand & Sons were paid in full. Grotto was liquidated. The balance owing and unpaid to Strand & Sons was $52,809.47. Strand & Sons charged that amount off as a bad debt of 1949. The Commissioner, in determining the deficiencies, held that the $52,809.47 was a capital investment and should have been added to the cost of the Grotto stock which became worthless in 1949. Strand & Sons paid liabilities of Grotto in the amount of $2,305.59 which were disclosed after the liquidation. That amount was deducted as expenses on the partnership return for 1949 and disallowed by the Commissioner on the ground that it also was a part of the cost of the Grotto stock. Grotto had 300 shares of stock outstanding at all times material hereto. Arvid and Elmer each held 149 and 2 were held by others until April 10, 1948, after which each petitioner held 100 shares. The change was effected by charging Ray with $10,000 and crediting Arvid and Elmer with $5,000 each on the books of Strand & Sons. Arvid and Elmer would have given Ray his onethird of the stock at any time upon demand. The parties involved did not limit the amounts paid in for stock and pile up accounts payable for Grotto with any ulterior *134 purpose to benefit themselves or Grotto income-tax-wise. They acted for business reasons without regard to income taxes. The partnership needed a larger supply of finished lumber than it could obtain in the open market. The original plan was to bring the experience, equipment and funds of Bride & Allen into the corporation. A down payment had been made to Nagel & Stevens Lumber Co. before Bride and Allen dropped out and the Strands decided to go through with the organization of Grotto because of the great needs of the partnership business. The $30,000 which they paid in as capital of Grotto was a substantial amount and was thought to be sufficient. It served to start Grotto in business. It was anticipated that not more than $20,000 would have to be loaned to Grotto. However, the needs of the partnership for finished lumber increased steadily and the capacity of Grotto had to be greatly increased. It built up large inventories of logs with which to supply Strand & Sons. It operated at a loss during its first year and the net total of the advances from Strand & Sons grew beyond the original estimates, despite substantial credits for lumber sold to the partnership. The advances were *135 carried as accounts payable by Grotto and as accounts receivable by Strand & Sons. Thus each recognized the liability of Grotto to repay the advances. Grotto reported a small profit in its second year and there was no increase in the total net advances in its more profitable third year. However, Grotto was not yet in position to decrease the net debt. Shortly thereafter the disasterous fire put an untimely end to the activities of Grotto and the Strands decided to liquidate Grotto rather than rebuild the mill and continue the saw and planing mill business. Such other creditors as there were were paid in full. Strand & Sons wanted the lumber. The losses resulted on the open accounts. Those accounts were the only evidence of the debt. There was no fixed maturity date. No interest was paid or credited. The record is silent on the subject of whether interest was to be paid. However, there obviously was no plan to drain off the earnings of Grotto through deductible interest to avoid dividends. The loans became rather substantial but the prospects of repayment were not particularly discouraging until the fire occurred. [Opinion] The parties do not disagree as to the controlling *136 principles upon which cases of this kind must be decided. They agree that each case must be decided upon its own facts. Those in this case do not closely parallel the facts in any cited case. There is present no sufficient reason for treating the advances of Strand & Sons as contributions to the capital of the corporation of which it was not a stockholder but only the principal customer and of disregarding the debt which was recognized by both the borrower and the lender. This is so despite the fact that the partners of the creditor were the stockholders of the debtor. The evidence fairly preponderates in favor of the petitioners and the conclusion of the Court from the entire record is that the advances were loans and gave rise to a bad debt. Another question argued is whether the debt was a business or non-business bad debt. Just how such a question got into the case is not clear but, in any event, there is no merit to the Commissioner's contention. The debt was directly related to and an incident of the business of Strand & Sons. Robert Cluett, 3rd, ; (March 10, 1954). It had no non-business aspects. The remaining *137 question is whether $2,305.59 paid by Strand & Sons to discharge obligations of Grotto discovered after the liquidation is deductible by Strand & Sons. That was done because the assets of Grotto had been distributed and Strand & Sons had received a substantial part of them. The stipulated facts on this point are too meager to justify any change in the determination of the Commissioner. Cf. ; , affd. . Decisions will be entered under Rule 50. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Arvid and Antonia Strand, Docket No. 46301; Elmer and Josephine Strand, Docket No. 46302; and Ray W. and Luella Strand, Docket No. 46303.↩